# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |  |
|---|---|---|---|
| SFG, Inc. | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | No. 19-cv-02198 | |
| v. | ) | | |
| | ) | Judge Andrea R. Wood | |
| KIMBAL MUSK, et al., | ) | | |
| | ) | | |
| Defendants. | ) | | |

## MEMORANDUM OPINION AND ORDER

Plaintiff SFG, Inc. ("SFG") owns and operates a restaurant called Next Door Bistro ("NDB") in Northbrook, Illinois. Defendants Kimbal Musk and The Kitchen Café, LLC ("TKC") own a series of restaurants with the phrase "Next Door" in their names, including one that opened in April 2019 in Vernon Hills, Illinois. SFG takes issue with the Vernon Hills restaurant, which operates under the name Next Door American Eatery ("NDAE"), claiming that Defendants' use of "Next Door" in the restaurant's name infringes upon SFG's common law trademark in violation of the Lanham Act, 15 U.S.C. § 1125(a). Now before the Court is SFG's motion for a preliminary injunction prohibiting Defendants from using the "Next Door" identifier in connection with NDAE, pending resolution of the merits of its claims. (Dkt. No. 9.) For the reasons detailed below, SFG's motion is denied.

## BACKGROUND

SFG is an Illinois corporation that owns and operates NDB, a restaurant in Northbrook, Illinois. SFG first opened an Italian restaurant called Francesco's Hole in the Wall in 1981. Then, in March 1995, SFG opened NDB physically adjacent to Francesco's Hole in the Wall. The two restaurants share a parking lot. NDB has been in constant operation since its opening. The restaurant often refers to itself and is known by some of its customers as "Next Door." By all

appearances, NDB is a successful restaurant; for example, during the time period 2015 through 2017, its annual gross receipts exceeded $2 million. (Hr'g. Pl.'s Exs. 6–8.)

Musk first launched the TKC restaurant group in 2003 in Boulder, Colorado, naming the group's first restaurant "The Kitchen." Subsequently, on June 13, 2011, Defendants opened a restaurant called "The Kitchen Next Door." As Defendants expanded upon this "Next Door concept" and opened additional restaurants in Colorado, they began to refer to those restaurants as simply "Next Door." TKC obtained a federal trademark registration for "Next Door" on May 5, 2015. TKC currently operates ten restaurants in Colorado, Illinois, Indiana, Ohio, and Tennessee employing the trademark "Next Door" in their names. (Hr'g Defs.' Ex. 5, Dkt. No. 30-5.)

In Fall 2018, several news sources in the Chicagoland area published articles announcing the launch of NDAE in Vernon Hills, a suburb of Chicago, in the spring of 2019. (Hr'g Pl.'s Exs. 18–20, 22–24, 32–33.) According to the articles—and Musk's own blog post—Musk plans "to open 20 Chicagoland locations of his Next Door restaurant brand as part of a massive national rollout of the burgeoning chain that he hopes will replace TGI Friday's and Applebee's." (Hr'g Pl.'s Ex. 19; *see also* Hr'g Pl.'s Exs. 18, 20, 22–24, 32–33.) NDAE eventually became TKC's first Next Door restaurant in Illinois. On October 29, 2018, SFG sent Defendants written notice of their claim to a common law trademark of the restaurant name "Next Door" and demanded that they change NDAE's name. (Hr'g Pl.'s Ex. 14.) Defendants responded with a letter on November 15, 2018, defending their use of the phrase and refusing to change the restaurant's name. (Hr'g Pl.'s Ex. 15.) On March 29, 2019, SFG initiated this lawsuit against Defendants. (Compl., Dkt. No. 1.) Meanwhile, on April 7, 2019, Defendants opened NDAE in Vernon Hills, approximately 12 miles away from NDB in Northbrook. Subsequently, on April 11, 2019, SFG

moved for a preliminary injunction. (Mot. for Prelim. Inj., Dkt. No. 9.) After allowing the parties time to conduct expedited discovery, the Court held a five-day evidentiary hearing. Having heard the evidence and arguments of the parties, the Court now finds that preliminary injunctive relief is not warranted.

## DISCUSSION

"An equitable, interlocutory form of relief, a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Valencia v. City of Springfield*, 883 F.3d 959, 965 (7th Cir. 2018) (internal quotation marks omitted). "It is never awarded as a matter of right." *Id.* (internal quotation marks omitted). When faced with a motion for preliminary injunction, the court conducts an analysis with two phases: "a threshold phase and balancing phase." *Id.* (internal quotation marks omitted). At the threshold phase, the party seeking the preliminary injunction must make three showings: "(1) absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to the final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) its claim has some likelihood of succeeding on the merits." *Id.* (internal quotation marks omitted). If all three requirements are met, the court then moves to the balancing phase and "weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* (internal quotation marks omitted). The court must also consider the public interest in denying or granting the injunction. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

### I. Likelihood of Success on the Merits

The Lanham Act provides in relevant part that a plaintiff may bring a civil action against

[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin . . . which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activity by another person.

15 U.S.C. § 1125(a)(1). In order to succeed on its trademark infringement claim, SFG must establish (1) that its "Next Door" mark is protectable, (2) that Defendant used the mark in commerce, and (3) that Defendants' use of the term is likely to cause confusion. *Ty*, 237 F.3d at 897. Because the parties do not dispute that Defendants used the mark in commerce, the Court's analysis focuses the legitimacy of SFG's common law trademark and the likelihood of confusion.

### A.        Whether SFG's Mark is Protectable

A plaintiff may show that its mark is protectable in several ways. First, it may establish that it registered the mark with the United States Patent and Trademark Office's ("USPTO") Principal Register, as "[r]egistration of a mark in the Principal Register is prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1057(b). When the plaintiff's mark is unregistered—as is the case here—the plaintiff has the burden to establish its entitlement to protection under the Lanham Act due to the "distinctiveness" of the mark. *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 727 (7th Cir. 1998).

"The first step in determining whether an unregistered mark or name is entitled to the protection of the trademark laws is to categorize the name according to the nature of the term itself." *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1085 (7th Cir. 1988). "Marks are often classified in categories of generally increasing distinctiveness . . . they may be (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *see also Packman v. Chi. Tribune Co.*, 267 F.3d 628,

641 (7th Cir. 2001). A generic term is "one that is commonly used and does not identify any particular source and therefore, is not entitled to any trademark protection." *Platinum Home Mortg.*, 149 F.3d at 727. A descriptive mark "describes the ingredients, qualities, or characteristics of an article of trade or a service" and may be protectable. *Id.* (internal quotation marks omitted). A suggestive mark "stands for an idea which requires some operation of the imagination to connect it with the goods." *Id.* (internal quotation marks omitted).

Applying these definitions to the record in this case, the Court finds that "Next Door" is best considered a descriptive mark. SFG's current owner and sole shareholder, Suzanna Gallo, testified at the preliminary injunction hearing that the restaurant's name stemmed from its location next door to a formerly related restaurant called Francesco's Hole in the Wall. The Court need not use its imagination to connect the term "Next Door" with a restaurant, which indicates the mark is not sufficiently distinctive to qualify as a suggestive mark. *See, e.g.*, *Platinum Home Mortg.*, 149 F.3d at 728 (affirming district court's determination that "not much imagination is required" to associate the term "platinum" with plaintiff's mortgage business).

While a term that is suggestive is automatically entitled to trademark protection, if a term is merely descriptive, the plaintiff must show that it has acquired "secondary meaning in the collective consciousness of the relevant community." *Id.* Courts consider several factors when deciding whether secondary meaning has been established: "(1) the amount and manner of advertising; (2) the sales volume; (3) the length and manner of use; (4) consumer testimony; and (5) consumer surveys." *Id.* (internal quotation marks omitted). SFG concedes that it does not advertise its business at all but rather relies entirely on word of mouth to grow its customer base. It also has not offered any evidence in the form of consumer surveys. However, NDB's sales volume is considerable: in 2015–2017, the restaurant's annual gross receipts exceeded $2

million. (Hr'g Pl.'s Exs. 6–8.) Also, SFG has used the Next Door mark as its restaurant name for almost 15 years. Finally, SFG has produced some testimony that its consumers refer to NDB as "Next Door." In sum, the Court concludes that SFG has sufficiently established a likelihood of success on the merits of whether its mark has a secondary meaning and is therefore protectable.[1]

### B. Likelihood of Confusion

As Defendants concede they used the Next Door mark in commerce, the Court turns its analysis to the third part of a Lanham Act claim: the likelihood of confusion. Likelihood of confusion is a "factual determination" based on an "equitable balancing test." *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000). Courts generally examine seven factors:

> (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the complainant's mark; (6) actual confusion; and (7) intent of defendant to palm off his product as that of another.

*Id.* at 1043–44 (internal quotation marks omitted). No single factor is dispositive, and this Court may assign varying weights to each of the factors, but three factors are considered "particularly important: the similarity of the marks, the defendant's intent, and actual confusion." *Id.* at 1044.

### 1. Similarity Between the Marks

Both SFG and Defendants use the mark "Next Door" in their restaurants' names. Defendants make much of the fact that SFG's restaurant is "Next Door ***Bistro***," whereas their restaurant is "Next Door ***American Eatery***." But where "one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." *Ty*, 237 F.3d at 898 (internal quotation marks omitted); *see Bedrock Mgmt., Inc. v.*

---

[1] Defendants conceded at the preliminary injunction hearing that SFG has "senior rights to the trademark 'Next Door' within her market area," which they believe to be within a five-mile radius of NDB.

*Peoples Choice Entm't, Inc.*, No. 14-cv-06624, 2014 WL 4979270, at *5 (N.D. Ill. Oct. 6, 2014)

("[I]n assessing the similarity of competing marks, a court may focus on the 'salient portion' of

the mark rather than its surrounding elements." (quoting *Sullivan v. CBS Corp.*, 385 F.3d 772,

777 (7th Cir. 2004))). The salient portion of the mark is the phrase "Next Door," which the Court

shall give greater weight than the surrounding elements of "Bistro" and "American Eatery." In

this sense, the parties' marks are essentially identical. *See, e.g.*, *Meridian Mut. Ins. Co. v.*

*Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1115–16 (7th Cir. 1997) (finding Meridian Insurance

Group confusingly similar to Meridian Mutual Insurance Company because "[a] person hearing

the two parties' names would likely focus on the word 'Meridian' and gloss over the other

words, and the parties are therefore using essentially the same mark"). The Court's conclusion is

further supported by testimony from multiple witnesses including Musk, Gallo, their employees,

and even customers that at times, both restaurants have been referred to as simply "Next Door."

In determining the similarity between the marks, the Court compares the parties' marks in

the context of what happens in the marketplace, not necessarily by looking at the two marks side

by side. *Ty*, 237 F.3d at 898. Where "the public will encounter the marks in written as well as

spoken form . . . it is essential to consider the marks' visual characteristics" as well. *Barbecue*

*Marx*, 235 F.3d at 1044. Indeed, at the preliminary injunction hearing, Gallo and several of her

customers testified that they discovered NDAE after seeing its outdoor sign.

Both on NDB's awning and its roadside sign, SFG's mark is displayed as "Next Door

BISTRO," with Next Door on one line and Bistro in all-capital letters below. (Hr'g Defs.' Ex.

33.) Next Door is spelled out in a neat sans-serif font, whereas "BISTRO" is spelled out in a

bold, geometric font. As depicted in the following two images, the roadside sign has a soft

yellow background and maroon letters and the awning has a maroon background and white letters:





On NDB's website, nextdoorbistro.com, "Next Door Bistro" is displayed differently and in multiple styles: at the top of the page, a blue oval containing a plate and a wine glass is decorated with a waving banner reading "NEXT DOOR BISTRO" in all capital letters. Below the oval and banner, "Next Door Bistro" is again displayed but in one line of gold, curly cursive font, as depicted in the following image:



Then, on the "Contact Us" section of the website sits a bright orange oval with a green border bearing another wine glass and plate, "Next Door" in a different cursive font and underlined, and "Bistro" in a simple sans-serif font. The following image depicts that design:



NDB's menu states "Next Door" in cursive font, and its carryout menu states "Next Door Bistro" in the same cursive font. (Hr'g Defs.' Exs. 14, 32.) The following image depicts that design:



Defendants' mark is more consistent. TKC registered several marks with the USPTO: "Next Door," "The Kitchen Next Door," and three logos. (Hr'g Defs.' Ex. 7.) One of the logos displays "NEXT DOOR AMERICAN EATERY" in all capital letters. Next Door is boldly spelled out in a narrow sans-serif font and the letters are an uneven black color—as if handstamped. American Eatery is displayed underneath with horizontal lines on either side, and

the words and lines are enclosed in a rectangle. (*Id.*) Defendants explain that they styled this mark after a license plate, with Next Door replacing the license plate number and American Eatery standing in for the state of issuance or state slogan. The following image depicts that logo:



This logo appears on NDAE's building sign, its menu, and its website, nextdooreatery.com. (*See* Hr'g Defs.' Exs. 1, 6.) The following three images depict the NDAE's building sign, menu logo, and website logo:


*NDAE's building sign*


*NDAE's logo on its menu*



*NDAE's logo on its website*

TKC also registered two additional logos that are identical except in color: "The mark consists of a circular logo with the stylized wording 'NEXT DOOR' at the top and 'AMERICAN EATERY' at the bottom, with the stylized letters 'ND' inside of the circle." (*See* Hr'g Defs.' Ex. 7.) One mark is in black and gray font, while the other is in orange and gray font, as shown in the following two images.



TKC's marks are visually distinct from SFG's, which undercuts SFG's argument that the marks are similar in appearance and suggestion. Still, as Defendants admit that both restaurants are commonly referred to as "Next Door," this factor weighs slightly in favor of SFG.

### 2. Similarity of the Products

The second factor in this Court's assessment of likelihood of confusion is the similarity between the parties' products. The key inquiry is whether the products or services "are the kind the public attributes to a single source." *Ty*, 237 F.3d at 899 (internal quotation marks omitted); *see also Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990) (holding that

trademark protection extends to "such other [products and services] as might naturally or reasonably be expected to come from [it]" (internal quotation marks omitted)). The Court received excruciatingly extensive testimony and other evidence on this issue at the preliminary injunction hearing.

While the parties do not dispute NDAE's status as an American restaurant, they hotly contest whether NDB is an Italian restaurant, American restaurant, or American *and* Italian restaurant. In the "About Us" section of NDAE's website, the restaurant is described as a "casual, informal restaurant that could become a part of people's everyday lives . . . a comfortable place with an urban feel." (Hr'g Def.'s Ex. 94.) By contrast, the "About Us" section of NDB's website tells the tale of Christopher Columbus, who "set forth on American soil in 1492 [and] launched a flood of immigration that is still in motion . . . . the Italian peninsula has sent millions of its people to the shores of North America. These new arrivals brought with them recipes from the old world." NDB then goes on to proclaim that it "serves American Italian cuisine," specifically the "finest Italian cuisine on the North Shore," and invites the reader to enjoy some "Fresh Italian Cooking."

The Yelp reviews website categorizes NDAE as "American (New)" and NDB as "Italian" only. (Hr'g Pl.'s Ex. 25, Defs.' Ex. 89.) The majority of Yelp reviewers described NDB as an Italian restaurant: comments include "Good Italian food," "Best Italian food out there," "This used to be one of my go to places for Italian food," "one of the best Italian eats in the suburbs." However, three of the 77 Yelp reviewers described NDB as an American restaurant: one called it "[a] solid American/Italian eatery," another called it "[a]n awesome American Bistro restaurant," and the third specifically stated, "The food is American with a touch of Italy – I wouldn't call it Italian."

The two restaurants' menus are considerably different. Some general overlap exists—for example, both restaurants offer soup, salad, and alcoholic beverages—but their primary offerings differ drastically. (Hr'g Defs.' Exs. 6, 14.) NDAE uses an all-day menu and is open every day from 11:00 a.m. to 10:00 p.m., not just during the lunch and dinner hours. (Hr'g Pl.'s Ex. 25.) Customers have the option of ordering a "snack & share" item to start, such as fries, hummus with chips and vegetables, or nachos, as well as "chicken bites" with different types of sauces. For their entrees, customers choose from either burgers, sandwiches, "plates" such as tacos or fish and chips, or "bowls" consisting of grains, vegetables, and a protein such as chicken, shrimp, or salmon. (Hr'g Defs.' Ex. 6.) No item costs more than $19. NDAE also makes efforts to cater to customers with dietary restrictions by including designated gluten-free and vegetarian options on its menu. Further, it characterizes its offerings as "clean" (chemical-free), "whole, unprocessed food" derived from local sources—"suppliers we know and trust"—and touts its sustainable, environmentally-friendly practices. (Hr'g Defs.' Ex. 52.) NDAE also has a children's menu with options such as macaroni and cheese and cheeseburger slider and games to play such as a word search and tic-tac-toe.

In comparison, NDB has distinct lunch and dinner menus and no children's menu. (Hr'g Pl.'s Ex. 11.) Its hours of operation include lunch service from 11:30 a.m. to 2:00 p.m. and dinner service from either 4:30 or 5:00 p.m. to 9:00 or 10:00 p.m., depending on the day of the week. "Next Door" is printed on the front of the menu, and underneath, the words, "Fresh Seafood, Homemade Italian & Steaks." Each menu has numerous sections, such as "entrees," "sandwiches," "appetizers & salads," "grilled specialties & meat," "poultry & seafood," and "pasta." The menu is primarily composed of Italian fare such as the "pappardelle giambotta,"

"chicken vesuvio," "seafood diavolo," and "chicken and eggplant parmesan with fettucine."[2] But NDB also offers a substantial number of items on its menu that could be characterized as American fare, such as the turkey burger, spinach tortilla wrap, omelet, and BBQ ribs. NDB's price point is higher than NDAE's; for example, the "grilled specialties & meat" range from $18.95 for the grilled Italian sausage to $36.95 for the New York strip steak, and the pastas range from $12.95 for the "baked chicken tortoloni [*sic*]" to $24.95 for the grilled prawns over linguini.

The restaurants are also different in décor and ambience. At the evidentiary hearing, Gallo described NDB as an intimate, "cozy" place. The outside of the restaurant is plain, with only the awning and some shrubbery for decoration, and the building looks to be several decades old. (Hr'g Defs.' Ex. 33.) The lighting is dim, and the floor is carpeted. Tables are covered in off-white vinyl tablecloths and set with cloth napkins. Pictures of Gallo with celebrities who visited her restaurant, large canvas paintings, and mirrors adorn the walls. (Hr'g Defs.' Ex. 13.) Show tunes and music by Frank Sinatra and similar musicians plays in the background. By contrast, NDAE has a contemporary exterior, composed of a mix of brick, steel, and wood. (Hr'g Defs.' Ex. 16.) The interior of the restaurant has high ceilings with exposed hanging light fixtures. The lighting is bright, with panels of floor-to-ceiling windows lining at least two of the four walls. There is a large U-shaped bar in the center, as well as a patio with outdoor seating. Indie and rock music plays in the background. NDAE's Yelp page indicates it is "Good for Kids," a description bolstered by the children's menu and large collection of board games

---

[2] The Court found disingenuous Gallo's attempts to characterize many of the items on NDB's menu as American cuisine. For example, while it is true that pasta could be styled as either American or Italian, the first four items listed in the pasta section are "rigatoni with homemade veal meatballs," "rigatoni chicken bolognese," "roasted eggplant" with fettucine, and "fusilli al forno," all dishes that contain Italian words in their names and consist of traditionally Italian ingredients such as capers, black olives, and ricotta cheese. In the same way, steak is often considered an American dish, but NDB's New York strip steak is served with "peppers, onions, [and] vesuvio potatoes," and its skirt steak is served with "pasta in tomato basil sauce."

available to guests, and dogs are allowed. (Hr'g Pl.'s Ex. 25, Defs'. Ex. 91.) Servers use iPads to communicate orders to the kitchen staff, and customers can order meals to-go online. Along with the usual cash and credit cards, it accepts payment via Apple Pay and Google Pay. (Defs.' Ex. 91.)

In light of the multiple and significant differences between the two restaurants, it highly unlikely that the public would attribute both NDB and NDAE to a single source. Thus, this factor weighs strongly in favor of Defendants.

### 3. Area and Manner of Concurrent Use

When considering the two marks' areas and manners of concurrent use, the Court must assess "whether there is a relationship in use, promotion, distribution, or sales between the goods and services of the parties." *Ty*, 237 F.3d at 900 (internal quotation marks omitted). "When the goods and services are in close competition, marks need not be as similar in order to find infringement." *Lettuce Entertain You Enters., Inc. v. Leila Sophia AR, LLC*, 703 F. Supp. 2d 777, 786–87 (N.D. Ill. 2010). Relevant factors include "(1) the relative geographic distribution areas; (2) whether there exists evidence of direct competition between the products or services; and (3) whether the product is sold through the same marketing channels." *Id.* (alterations and internal quotation marks omitted).

The evidence indicates that any overlap between the two restaurants in geographic reach or customer base is minimal. For starters, the two restaurants are at least 11.8 miles apart. (Hr'g Pl.'s Ex. 38.) NDB is in Northbrook, a town which does not even border Vernon Hills, where NDAE is located. In fact, Vernon Hills is several towns away: Deerfield, Riverwoods, Bannockburn, and Mettawa are all towns located between NDAE and NDB. NDAE is located inside the Mellody Farm shopping center in Vernon Hills. Back when Defendants were still

debating where to open the first Illinois location of NDAE, Regency Centers, the company that owns Mellody Farm, sent them a brochure mapping out the geographic range and providing the customer demographics of the shopping center. The map did not extend to Northbrook nor did the brochure include demographic information about Northbrook's residents. A Yelp search for restaurants in and within five miles of Vernon Hills yields 159 results: 77 in Vernon Hills and 82 in surrounding towns. (Hr'g Def.'s Ex. 17.) From this evidence, the Court finds that NDB and NDAE have distinct geographic service areas. *See Barbecue Marx*, 235 F.3d at 1045 ("[C]ontext is key . . . . 1.4 miles is quite a distance, especially in an area crowded with dozens of restaurants, as these neighborhoods are.").

But the Court's decision on this factor is not based merely on distance and restaurant density. Defendants enlisted several experts to testify as to this issue. Defendants' expert Bruce Marder, a restauranteur with more than 40 years of experience in the food industry, stated that based on his experience in the restaurant industry, "any concern or dispute about potential competition between restaurants is typically resolved by using a five (5) mile buffer or radius." (Hr'g Def.'s Ex. 28.) He also testified that "it is extremely unlikely that a patron normally would be willing to drive the half hour from Vernon Hills to Northbrook for dinner." (*Id.*) Similarly, Defendants' expert Chris Tripoli, a hospitality industry consultant, testified that "[l]ocations that are this distance apart requiring a drive time of over 15 minutes on the expressway are far too distant to be considered within the same market area." (Hr'g Def.'s Ex. 27.) Tripoli added that the restaurant industry customarily measures a location's "competitive market area" by drawing a three to five-mile radius. (*Id.*)

Finally, Defendants' expert William Hoag, a licensed real estate broker based in Chicago, testified that based on his experience dealing with restaurant leases in Chicago and the

surrounding area, "[n]either [restaurant] draws from the other's market area, either geographically or in type of customer." (Hr'g Def.'s Ex. 34.) Hoag explained that NDB is "situated at the nexus of affluence in the North Shores communities" of Chicago, which consist of "older, wealthier communities" with "predominantly Caucasian" residents and "one of the largest pockets of Jewish density in the Metro [Chicago] market." (*Id.*) By contrast, Hoag claimed that Vernon Hills, where NDAE is located, is a community "geared toward younger families as it is more affordable" yet has a "strong" school system. Vernon Hills is composed of "overwhelming Christian and Catholic" residents and with "noted growth in its Hispanic density." (*Id.*) In providing these descriptions of Northbrook and Vernon Hills, Hoag drew upon his experience representing one of the largest commercial leasing landlords in the Midwest, a company that leases properties in both towns—including a building adjacent to NDB. In addition, Hoag confirmed Marder and Tripoli's contention that the relevant area in measuring geographic reach is at most a "5 mile band[] around the proposed location." (*Id.*) Defendants also offered a report created by Uber Media through Hoag's testimony at the hearing, which purportedly reveals where customers of NDB live and work as well as their locations 20 minutes prior to visiting NDB. (Hr'g Defs.' Ex. 38.) According to Hoag and the Uber Media report, the overwhelming majority of NDB customers live and work in the 60035 zip code, which includes Northbrook and the immediately adjacent communities and excludes Vernon Hills.

Despite Hoag's testimony and the Uber Media report, the Court acknowledges that both restaurants are located in Chicagoland or the suburbs of Chicago, where many residents have cars and some may be willing to drive dozens of miles to reach their intended destination. Moreover, according to Hoag, a limitation of the Uber Media report is its reliance on cell phone users who have downloaded the Uber ride-sharing app. Although Hoag claims 40% of the U.S.

population has downloaded Uber onto their phones, he also concedes that older individuals and residents of the suburbs are more likely to be excluded from that population.

SFG, for its part, argues that it draws customers from all over the Chicagoland area, including Vernon Hills. As evidence, SFG submitted a collection of index cards with handwritten notations. (Hr'g Pl.'s Ex. 12.) Gallo testified that she distributed the cards to customers of NDB and asked them to write down their names and where they live. Gallo testified that her motivation for collecting the cards was "for [her] own curiosity" and to feel a sense of personal satisfaction over her restaurant's ability to attract customers without advertising. According to Gallo, the cards prove that NDB draws customers from Vernon Hills; other Chicagoland suburbs such as Highland Park, Lincolnwood, and Palatine; and even downtown Chicago.

However, the Court has serious doubts as to the reliability of the index cards and Gallo's testimony about them. As a preliminary matter, the cards are plainly hearsay: out-of-court statements made for the truth of the matter asserted. Fed. R. Evid. 801(c). Gallo attempts to get around this hearsay problem by reference to the business records exception, Fed. R. Civ. P. 803(6), claiming that she has engaged in this index-card practice as part of her regular course of business for over ten years, disposing of old cards every 8–12 months. But the Court does not find Gallo's claim credible, as she did not produce any cards from before she filed her complaint five months prior, nor did she describe with specificity her system for collecting and preserving the cards. Furthermore, the Court cannot ignore the possibility that Gallo cherry-picked which customers she distributed the cards to, favoring those who were not regulars, and discarded any cards indicating that the customer lived in Northbrook. Indeed, not one of the cards had Northbrook written on them. Finally, the mere fact that a customer hails from outside

Northbrook or the surrounding communities does not mean that NDB's geographic distribution area extends to that customer's hometown. For example, SFG submitted an index card with "Scottsdale AZ" written on it, but the Court does not view the card as evidence that NDB draws customers from Arizona. Therefore, the Court finds that Gallo's testimony about the index cards is not credible and does not establish a basis to apply the business records exception to the hearsay rule, and thus affords the card no weight in its analysis.

SFG also argues that even if the Court concludes that NDB is too far away from NDAE in Vernon Hills to share a geographic distribution area, Defendants intend to open 20 other locations in Chicago and the surrounding area, which will eventually encroach upon NDB in Northbrook. However, both Musk and Donald Degnan, the CEO of The Kitchen Café, testified at the hearing that the company has since changed direction. Defendants represent that at this time, they have no concrete plan to open another NDAE location in suburban Chicago, nor do they have the capital to do so. While Musk did express his hopes to open additional NDAE restaurants in suburban Chicago in an April 26, 2018 board meeting presentation and a September 17, 2018 blog post (Hr'g Pl.'s Ex. 30), this evidence alone is too scant to support SFG's assertion of an imminent invasion by NDAE—especially in light of Musk and Degnan's testimony that it takes about two years and at least $1.6 million to open a new location. *See, e.g.*, *Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 830 (C.D. Ill. 2009) ("[Plaintiff] has not submitted any business plans, emails, internal memoranda, or deposition testimony to support a finding that [Defendant] is reasonably expecting to enter the Illinois banking landscape . . . .").

In addition, NDB has not presented substantial evidence that it competes with NDAE for business. As previously discussed, the two restaurants differ significantly in terms of menu

offerings, price point, and ambience. The record also suggests that they differ in terms of target customer. NDAE's executives and employees testified at the hearing that they designed the restaurant to attract millennials and young families who are interested in affordable, healthy food. For this reason, Defendants chose to open NDAE in Vernon Hills, a community with younger residents, specifically at Mellody Farm, which boasts several large retailers such as HomeGoods, Nordstrom Rack, REI, and Whole Foods. Mellody Farm contains a dozen restaurants including NDAE, most of which are chain restaurants like NDAE.

By contrast, NDB's closest neighbor is Francesco's Hole in the Wall, and the other surrounding businesses include a nursing home, a Catholic church, and a bank branch. According to Gallo, approximately half of NDB's customers are regulars, with some dining there as many as three times a week. Many of the guests are personally familiar with Gallo, who testified colloquially that she "knows everybody." Wislawa "Bridget" Redlich, the hostess at NDB, testified that there are many customers in their 70s and 80s, an observation confirmed by multiple witnesses who have personally visited NDB such as Hoag and William Vincent, Defendants' private investigator.

Finally, the Court addresses NDB's and NDAE's respective marketing channels. According to Gallo, NDB does not advertise at all other than through word of mouth. By contrast, NDAE relies heavily on social media to advertise—a logical decision given its stated intent to attract millennial customers. Thus, the two restaurants do not use the same marketing channels. The Court acknowledges that given the wide geographic reach of the internet, NDAE's use of social media makes it more likely that NDAE is drawing customers from NDB's geographic distribution area. However, the *de minimis* nature of any such competition warrants

the Court's conclusion that this third factor—area and manner of concurrent use—strongly weighs in favor of Defendants as well.

### 4. Degree of Care Likely to be Exercised by Consumers

Generally, "[t]he more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE Inc. v. Clean Air Eng'g., Inc.*, 267 F.3d 660, 683 (7th Cir. 2001). SFG argues that both restaurants offer "standard American cuisine" such as soup, seafood, chicken, hamburgers, and french fries as well as a full bar. However, a closer examination of each restaurant's offerings suggests that a customer hoping to dine at NDB is unlikely to consider NDAE's entrees comparable. For example, the cover page of NDB's menu represents that it offers "Fresh Seafood, Homemade Italian & Steaks." Wild Chilean sea bass, Branzino, lobster tail, and grilled mahi-mahi are only a few of NDB's many seafood dishes. By contrast, a customer hoping to order seafood at NDAE would be forced to choose from entrees such as "Honey Sriracha Crispy Gulf Shrimp Bowl," "Pan Roasted Salmon," "Fish & Chips," and "Salmon Burger." NDAE does not have pasta or steak on its menu. It is not difficult to imagine that a shopper at Mellody Farm would be less discerning when choosing whether to dine at NDAE or one of the other dozen restaurants at the shopping center. *See, e.g.*, *Lettuce Entertain You*, 703 F. Supp. 2d at 788 ("Therefore, LEYE and defendants are competing for restaurant goers seeking a casual and inexpensive lunch, and such consumers are assumed to exercise a lesser degree of care."). However, the Court is unconvinced that diners hoping to dine at NDB would "hop in the cab and wing it—perhaps to the wrong restaurant," and be satisfied with NDAE as a substitute. *Barbecue Marx*, 235 F.3d at 1045.

Moreover, the Court "expect[s] that customers will exercise a reasonable degree of care when planning to dine at a restaurant of [critically-acclaimed] caliber." *Barbecue Marx*, 235 F.3d at 1045. SFG contends that NDB has a strong reputation in the community, "as demonstrated by its multi-millions-dollars [*sic*] annual revenues, profitability, favorable reviews and voluminous repeat customers." (Compl. ¶ 19(d).) Indeed, several of NDB's regular customers testified at the hearing about their loyalty to the restaurant—Gallo, in particular—and raved about the deliciousness of the food. These customers also testified that they would not be remotely interested in dining at a restaurant like NDAE. *See, e.g.*, *Kastanis v. Eggstacy LLC*, 752 F. Supp. 2d 842, 854 (N.D. Ill. 2010) ("Kastanis also testified in his deposition that Yolk customers are picky about where they eat. In addition, Verros testified that . . . New Yolk New Yolk's customers . . . are 'very picky.' Based on the evidence . . . we find that customers of both [restaurants] likely will exercise a reasonable degree of care when choosing to dine at the restaurant of their choice."). After hearing this testimony and reviewing NDB's recent tax returns, the Court is inclined to agree that over the last 23 years, NDB has established its reputation as an acclaimed, high-caliber restaurant. This recognition, while perhaps flattering to NDB, ultimately weighs against the likelihood of confusion.

Because the Court finds that the customers are likely to exercise a significant degree of care when deciding whether to patronize NDB versus NDAE, this factor weighs against SFG.

### 5.    Strength of the Complainant's Mark

"The stronger the mark, the more likely it is that encroachment on it will produce confusion." *AutoZone v. Strick*, 543 F.3d 923, 933 (7th Cir. 2008) (internal quotation marks omitted). Courts analyze the strength of a party's mark by evaluating its overall "economic and marketing strength." *Id.* Economic and marketing strength depends on the "distinctiveness of the

mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular . . . source." *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000). The only ways to directly prove the public's evaluation of a mark are through customer testimony and consumer surveys. *Gimix Inc. v. JS & A Grp., Inc.*, 699 F.2d 901, 907 (7th Cir. 1983). But the Court may also consider evidence of the frequency of the mark's display and the quantity of advertising dollars used to promote the mark as relevant factors to the mark's strength. *See AutoZone*, 543 F.3d at 933. In addition, a party may show the strength of its mark through long-term, continuous use and good reputation. *See Barbecue Marx*, 235 F.3d at 1045.

As previously explained, SFG's mark is not particularly distinctive: the Court characterizes the mark as descriptive, the second lowest of the five levels of distinctiveness. And to this point, Defendants have shown that the "Next Door" identifier is used by a variety of other restaurants, bars, and cafés across the country, including but not limited to "Next Door Café" in Chicago, "Next Door" in Connecticut, "Next Door Lounge" in Kentucky, "Next Door Burger Bar" in Massachusetts, "Next Door Cocktails & Co." in Michigan, "Next Door Kitchen & Bar" in New York, "Next Door Tavern" in Ohio, "Next Door Bar & Lounge" in Texas, and both "Next Door Pub & Pizzeria" and "Next Door Brewing Co."—unrelated businesses—in Wisconsin. (Hr'g Defs.' Ex. 20.) Considering the parties share a name with all these other establishments as well, the strength of NDB's mark does not stem from its distinctiveness.

Nor can SFG rely on the frequency of its mark's display or amount of advertising dollars spent. As displayed above, SFG's mark is noticeably inconsistent: its roadside sign, awning, website, and menu all display unique logos that do not resemble one another in style, color, or font. Further, SFG has admitted that it does not advertise at all, and thus its mark is displayed only at or immediately outside the premises of the restaurant. Instead, SFG relies on word of

mouth from its customers to attract new business to NDB. On that topic, SFG has offered some customer testimony that its mark is well-known among members of the community but no survey evidence to that effect. The Court acknowledges that SFG has continuously used the Next Door mark since 1995, a span of over 23 years, and has "built a reputation for good [food], as its rave reviews . . . and ability to depend on word-of-mouth advertising demonstrate." *Barbecue Marx*, 235 F.3d at 1045. However, SFG has not established that NDB's recognition and acclaim extends to Vernon Hills, approximately 12 miles away. *See, e.g.*, *Kastanis*, 752 F. Supp. 2d at 855 ("Although [Plaintiff] may have established some recognition and acclaim in and around downtown Chicago, that reputation does not necessarily extend to the suburbs or, more specifically, to Hinsdale 16 to 18 miles away."). Indeed, Musk and Degnan testified that when they sought to open NDAE in Vernon Hills, none of the leasing agents, contractors, vendors, or other entities with whom they conducted business mentioned NDB's existence. Musk, however, admitted "other than [relying on his] knowledge of the general Chicago area," he did not take any special measures to learn whether any nearby restaurants used the mark "Next Door." Still, because NDB has established name recognition and good reputation within Northbrook and some of the immediately neighboring communities, this factor weighs slightly in SFG's favor.

### 6.    Actual Confusion

Evidence of actual confusion is not required to prove that a likelihood of confusion exists. *CAE*, 267 F.3d at 685. But evidence of actual confusion is considered particularly important to the Court's analysis of the likelihood of confusion. *Barbecue Marx*, 235 F.3d at 1044. In determining whether a plaintiff has presented evidence of actual confusion, the Court is "concerned . . . with evidence of ***actual*** confusion, not a mere risk of confusion." *Eli Lilly & Co.*, 233 F.3d at 465.

Evidence of actual confusion often takes the form of a consumer survey, but SFG has not conducted any such survey. Instead, SFG offers the testimony of two customers, Kathleen Brown and Sidney Rosenberg, who both claim to be regular customers of NDB. Brown testified that in the fall of 2018, a good friend of hers, Ron Hoffman, incorrectly told her that Gallo had opened a restaurant in Vernon Hills. Hoffman stated that he thought NDAE was Gallo's restaurant because it had the same name, Next Door. Brown also testified that approximately two weeks later, she had a similar conversation with another friend, Lewis Wolf. Wolf said that one of his daughters told him Gallo intended to open another restaurant.

SFG also offers the testimony of Gallo and Redlich, who both testified that on multiple occasions, customers expressed their confusion about the association between NDB and NDAE. Gallo testified that "hundreds" of customers told her that they initially believed that NDAE was a second location of NDB. Redlich similarly testified that after NDAE opened, customers repeatedly asked her whether Gallo had opened another restaurant in Vernon Hills. But Gallo could only name three individuals—Sperling, Rosenberg, and a third individual she only knew as "Bartucci"—and Redlich did not name any. *See Kastanis*, 752 F. Supp. 2d at 855 (N.D. Ill. 2010) ("Testimony by owners and employees has been found to be weak evidence of actual confusion . . . [especially] where employees were not able to testify with any specificity regarding [the alleged] customer inquiries or the purported instance of consumer confusion, to identify any customers who allegedly were confused or when these encounters occurred." (citing *Echo Travel Inc. v. Travel Assocs., Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989))). Gallo additionally claimed that she made written notes every time someone expressed confusion to her, but she failed to produce any such notes. And when asked about their location, she vaguely answered, "at home." The Court thus considers most of Gallo's testimony on this issue too

general and conclusory to be afforded much weight, and instead concludes that, at most, a handful of customers made such statements to Gallo or Redlich, rather than the hundreds Gallo described.[3]

Gallo further testified that once, a delivery truck from the Sysco company came to NDB with a delivery meant for NDAE. But again, her recounting of this incident lacked key details, such as the date. And when cross-examined about the incident, Gallo admitted the deliveryman never stated that his delivery was intended for NDAE; rather, she made that inference herself. In fact, Degnan testified that NDAE does not work and has never worked with Sysco. Gallo similarly testified that on one occasion, Sal Russatievi, a deliveryman for Turano, NDB's bread vendor, asked her about the association between NDB and NDAE. However, Russatievi did not provide any type of sworn statement or testify at the hearing, despite SFG's initial representation to this Court that he would do so, and thus the Court gives little weight to the hearsay offered by Gallo.

In addition, Gallo testified about two specific incidents when a customer experienced actual confusion. According to Gallo, Sperling told her that a couple in Northbrook once went to NDAE for dinner and "the wife was very disappointed, as she thought it was [NDB]." Another time, a woman came to NDB for lunch and ordered a soft drink. Eventually, the woman realized

---

[3] Defendants submitted the sworn declarations of Andrea Wright, a hostess at NDAE, and Megan Venette, a bartender at NDAE. Wright claimed that in the three months that she has worked at NDAE, only twice did a customer ask whether the restaurant was associated with NDB. On the first occasion, in April 2019, an approximately 50-year-old woman asked Wright as they were walking to a table, "Are you associated with the Next Door in Northbrook?" On the second occasion, also in April 2019, a man with "salt-and-pepper hair in his 40s or 50s" asked Wright if NDAE was "associated with the Next Door in Northbrook." Venette similarly claimed that in the three months that she has worked at NDAE, only once did a customer ask whether the restaurant was associated with NDB: in April 2019, Venette to spoke a woman on the phone who asked, "Are you associated with Next Door in Northbrook?" Venette also described a separate incident in May 2019, when two women having lunch at NDAE informed her that the third member of their party had mistakenly gone to NDB. The Court views Wright and Venette's testimony as similarly weak evidence because they are Defendants' employees. However, their testimony is slightly more persuasive due to the greater level of detail.

that she was in fact supposed to meet her dining companions at NDAE, not NDB, and immediately left. When pressed for details about this particular incident, Gallo first stated that the incident occurred three weeks ago, then she stated that it could have been three months ago. Gallo did not know the names of any of those customers.

Redlich told the same story about the woman who ordered a soft drink when she testified at the hearing. She also described two additional incidents. In the first, Redlich spoke on the phone with an individual who had mistakenly called NDB while trying to make a reservation at NDAE. In the second, a man came to NDB hoping to meet his party of ten, but his party was at NDAE instead of NDB. Keeping in mind that several months have passed since NDAE's opening in April 2019, the Court concludes that SFG has produced only nominal evidence of actual confusion amongst consumers. *See, e.g.*, *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, 805 F. Supp. 2d 503, 520 (N.D. Ill. 2001) ("Courts in this circuit consistently have rejected vague summaries of hearsay statements by unidentified consumers.") (summarizing cases); *Kastanis*, 752 F. Supp. 2d at 855 ("None of [Plaintiff's] employees could identify with specificity any of the telephone calls they received from potentially confused consumers, nor did they point to diversion of any business from [Plaintiff's restaurant] as a result.").

Moreover, "evidence of occasional inquiries [about whether two restaurants are affiliated] is superficial and trivial in the absence of evidence of actual diversion of business." *Kastanis*, 752 F. Supp. 2d at 855 (citing *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 220 (7th Cir. 1978)). Here, SFG has not offered convincing evidence that NDAE is syphoning business from NDB. While Gallo stated at the hearing that in her opinion, business at NDB has "slightly" slowed down since NDAE opened, she relies solely on the observations "all in [her] head" of "people coming in how empty when they leave and what time they come in and what time they

leave." And when questioned whether NDB's revenue has decreased since NDAE opened, Gallo answered that she did not to know because she has no idea how much money her restaurant makes every week. Gallo admitted that she personally pays NDB's bills and deposits NDB's checks at the bank every week but nonetheless claimed that she does not look at the numbers on them or otherwise keep track of her restaurant's financials. Considering Gallo's position as the owner, sole shareholder, and main proprietor of NDB, the Court finds her testimony completely unbelievable. Gallo's claim of decreased business is also undermined by Redlich's testimony that NDB is "busy almost every night," with tables being "turned over multiple times." As SFG has offered no other evidence of decreased revenue since NDAE's opening, the Court concludes that NDAE is not diverting business from NDB.

Finally, as of August 2019 the parties' respective Yelp pages each have approximately 80 reviews, for a total of approximately 160 reviews. After reading these reviews, the Court did not find any evidence that a reviewer either falsely believed the two restaurants were associated or posted a review for one restaurant on the other's page. While the Court is certainly cognizant that only a very small percentage of a restaurant's customers use Yelp, the complete lack of mistake in such a substantial number of reviews has at least some relevance.

Ultimately, as stated by the Seventh Circuit, some incidence of actual confusion, if *de minimis*, is insufficient to establish a likelihood of confusion. *See Platinum Home Mortg.*, 149 F.3d at 729; *see also King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092–93 (10th Cir. 1999) (finding seven examples of actual confusion insufficient to support a finding of likelihood of confusion). SFG's evidence of actual confusion is *de minimis* at best. Therefore, this factor weighs in favor of Defendants.

### 7. Intent of Defendants

The final factor is Defendants' intent to "palm off their product as that of another." *Barbecue Marx*, 235 F.3d at 1046. SFG does not dispute that this factor weighs in Defendants' favor. Regardless, the Court briefly summarizes the evidence supporting this conclusion.

First, NDAE is one of a chain of "Next Door" restaurants operated by TKC, which was originally founded and developed in Boulder, Colorado. Defendants had already opened several Next Door restaurants throughout the Midwest region before launching NDAE in Vernon Hills, and NDAE is modeled after those pre-existing restaurants. Second, Defendants registered the Next Door mark and logo with the USPTO, evidencing their intent to put others on notice of their specific use of the mark and make a name for themselves. (Hr'g Defs.' Ex. 7.) Third, Musk and Degnan testified that they did not know of NDB's existence when they decided to open NDAE in Vernon Hills, which the Court finds reasonable given the nearly 12-mile distance between the restaurants and the fact that NDB operates at only one location. Fourth, the dramatic and numerous differences between the two parties' restaurants suggests that Defendants did not intend for customers to associate NDAE with NDB. *See, e.g.*, *Lettuce Entertain You*, 703 F. Supp. 2d at 789 ("The restaurant's . . . independent, neighborhood style . . . leads to the conclusion that defendants did not seek to pass it off as one of [Plaintiff's] restaurants, which tend to be larger and more commercial."). Finally, the Court once again points out that the mark at issue here is merely descriptive in its distinctiveness. "[U]sing a descriptive phrase . . . is consistent with the inference that defendants intended" to act in good faith. *Packman*, 267 F.3d at

644. Therefore, this final factor supports Defendants' argument against the likelihood of confusion.

In summary, the only two factors in the Court's analysis that weigh in SFG's favor are the similarity between the marks in appearance and suggestion and the strength of the complainant's mark. The remaining five factors all weigh in Defendants' favor. And of the factors that are considered particularly important, similarity of the marks weighs only slightly in Plaintiff's favor, whereas intent and actual confusion weigh strongly in Defendants' favor. Accordingly, SFG has not demonstrated a likelihood of confusion in this case. And given this result, the Court finds SFG has a low likelihood of success on the merits of its Lanham Act claim, which warrants denial of its motion for a preliminary injunction. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).

## II.     Inadequate Remedy at Law and Irreparable Harm

Although SFG has failed to meet its burden of showing a likelihood of success on the merits, the Court nonetheless considers whether SFG has met the remaining requirements for a preliminary injunction: showing "that it has no adequate remedy at law, and that it will suffer irreparable harm if the relief is not granted." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002). Irreparable harm is harm that is "not fully compensable or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in the plaintiff's favor." *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013).

The Seventh Circuit has traditionally applied a presumption of irreparable harm in trademark infringement suits. *See Eli Lilly & Co.*, 233 F.3d at 469; *Abbott Labs.*, 971 F.2d at 16 ("[I]t is virtually impossible to ascertain the precise economic consequences of intangible harms,

such as damage to reputation and loss of goodwill, caused by [trademark infringement] violations."). Following the Supreme Court's decision in *eBay Inc. v. MerExchange, L.L.C.*, 547 U.S. 388 (2006), the Seventh Circuit held that the presumption of irreparable harm no longer applies in patent and copyright cases. *See Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012). A subsequent Seventh Circuit case suggests that the presumption still applies in trademark cases. *See Kraft Foods*, 735 F.3d at 741 ("[I]rreparable harm is especially likely in a trademark case because the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion (and the interval between the filing of a trademark infringement and final judgment is sure not to be trivial)."). Yet some district courts in this Circuit have expressed doubt about whether that presumption is still viable. *See, e.g.*, *Market Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *23 (N.D. Ill. June 12, 2015); *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 WL 3633987, at *12 (N.D. Ill. June 10, 2015). Given the Seventh Circuit's relatively recent reliance on the presumption and the fact that this matter is before this Court on a motion for a preliminary injunction, the Court will apply the presumption here. Accordingly, the Court presumes that because SFG has asserted a claim for trademark infringement, it will suffer at least some irreparable harm and will not have an adequate remedy at law.

Defendants raise the argument that SFG has delayed in pursuing injunctive relief, which if true, negates the presumption of irreparable harm. *See, e.g.*, *Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953–54 (N.D. Ill. 2018) (holding that plaintiff's unexplained 18-month delay in seeking injunctive relief on its trademark infringement claim precluded finding of irreparable harm); *Impact Networking, LLC v. Impact Tech. Sols., Inc.*, No. 17 C 5205, 2018 WL 1469004, at *8 (N.D. Ill. Mar. 26, 2018) (finding that plaintiff's 1-year

delay precluded finding of irreparable harm). But the Court is unconvinced that any delay occurred here. The timeline of events leading up to this litigation illustrate that in Fall 2018, several Chicago-based news sources published articles announcing that NDAE would be opening soon in Vernon Hills. According to Gallo, one Sunday morning that fall, Bob Sperling, one of her regular customers called her to say that he had seen a Crain's Chicago article about NDAE opening in Vernon Hills. Gallo then drove to NDAE's site and saw the sign herself. On October 29, 2018, SFG sent Defendants written notice of their common law trademark of the Next Door name and asked them to change their restaurant's name. On November 15, 2018, Defendants responded with a letter defending their use of the mark and refusing to change NDAE's name. In the meantime, Gallo met with Musk and Degnan—at their invitation—to discuss the possibility of settlement. On March 29, 2019, SFG filed its Complaint, and two weeks after that, it moved for a preliminary injunction. The Court declines to infer from SFG's approximately four-month delay that SFG "lulled" Defendants into a "false sense of security." *Miyano Mach. USA, Inc. v. MiyanoHitec Mach., Inc.*, 576 F. Supp. 2d 868, 887–88 (N.D. Ill. 2008) (internal quotation marks omitted). In any event, SFG's cease-and-desist letter, which was sent shortly after the stream of news articles about NDAE, should have put Defendants on notice that SFG intended to enforce its rights.

### III.    Balancing of Harms

As the Court's decision hinges on SFG's inability to show a likelihood of success on the merits of this case, the Court need not move on to the subsequent balancing phase for preliminary injunctions. However, for the sake of thoroughness, the Court addresses the parties' evidence about the harms they would suffer as a result or in the absence of a preliminary injunction.

When balancing the harms each party may suffer, the Seventh Circuit applies a sliding scale approach: "[T]he more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Kraft Foods*, 735 F.3d at 741 (internal quotation marks omitted). The sliding scale approach "is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty*, 237 F.3d at 896 (internal quotation marks omitted). As previously explained, SFG's likelihood of success on the merits is slim, necessitating a stronger showing that the balance of harm weighs in its favor.

SFG argues that the balance of harms warrants a preliminary injunction because allowing NDAE and NDB to coexist would ruin the goodwill and reputation that NDB has developed in the Chicagoland area over the last 23 years. Gallo testified that several customers told her they had dined at NDAE and found the food inferior to NDB's. However, when asked for examples, Gallo only described one individual, Glen Jerrold, who supposedly told her he had a bad hamburger at NDAE. The Court finds this single example too weak to show that NDAE poses a real threat to NDB's reputation. SFG also points out that NDAE has received some negative reviews on the Yelp website. However, NDB too has some negative reviews, and the two restaurants have the same overall rating on Yelp: 3.5 out of 5 stars. SFG also offers Gallo's testimony that customers have informed her of their negative experiences at Defendants' restaurant, with several of them assuring her that NDAE's food is nowhere near the caliber of NDB's. But such statements are hearsay, and Gallo has not described these alleged comments with enough specificity to be reliable; for example, Gallo could not recall the source or date of these alleged comments. Moreover, SFG has offered no evidence whatsoever that since NDAE's

opening NDB's revenues have declined, or its reputation worsened. Still, as the Court has acknowledged, in trademark infringement cases, some irreparable injury is presumed.

By contrast, Defendants argue that a preliminary injunction forbidding them from continuing to operate as NDAE would be "catastrophic." At the time of this Order, NDAE has been in operation for more than four months. According to Musk and Degnan, a preliminary injunction would force them to close down NDAE, terminating 44 employees and depriving multiple vendors and suppliers of considerable business. Defendants claim that operating by any other name would violate their lease with Mellody Farms, as the lease contains language requiring them to "conduct [their] business solely under the [current] trade name." (Hr'g Defs.' Exs. 12, 43.) Defendants explain that the shopping center specifically sought them out and requested a Next Door restaurant. Defendants additionally contend that even if they could somehow continue operating NDAE under a new name, they would be forced to expend time and resources selecting a new name, altering the signage and menus, and advertising under that new name. (Hr'g Defs.' Ex. 92.) In this rebranding period, Defendants anticipate a loss of goodwill, with business "fall[ing] off dramatically" and some guests perhaps "lost forever." In addition, a preliminary injunction would derail Defendants' long-term goal of establishing a chain of Next Door restaurants across the country. As previously discussed, TKC currently operates ten Next Door restaurants in Colorado, Tennessee, Indiana, Ohio, and Illinois—including NDAE in Vernon Hills—and plans to open an eleventh in Colorado this fall.

Finally, the Court must consider the public interest in denying or granting the injunction. *Ty*, 237 F.3d at 895. Enforcement of trademark law serves the public interest by reducing consumer confusion. *See Eli Lilly & Co.*, 233 F.3d at 469. On the other hand, "trademark protection should not interfere with traditional policies of a competitive market." *Platinum Home*

*Mortg.*, 149 F.3d at 726. The Court has already determined that there is a low likelihood of confusion here. Although both parties have restaurants called "Next Door," they use the phrase in different contexts. For example, SFG's choice of the name "Next Door" reflects its location next door to Francesco's Hole In the Wall. By contrast, Defendants' choice of name reflects their intent to design a "neighborhood place to stop in anytime of the week," "a place where you can have fun with your friends and family and eat craveable, nourishing real food." (Hr'g Pl.'s Ex. 21A.) The Court need not strain its imagination to see that a phrase like "Next Door" could take on a multitude of different meanings. And based on the abundance of other businesses that currently use the "Next Door" mark—including but not limited to TKC—the Court sees no reason to award SFG a monopoly over that phrase. *See Best Vacuum Inc. v. Ian Design Inc.*, No. 04 C 2249, 2005 WL 1185817, at *17 (N.D. Ill. Jan. 18, 2005) ("An essential component of competition is availability of words for advertising, promoting, and informing the public."); *see also Kastanis*, 752 F. Supp. 2d at 859 ("Defendants argue that Plaintiffs do not have a monopoly on the word 'yolk' in the market place generally, and we agree."). Thus, the public interest is best served by allowing Defendants to continue their respective use.

Based on the record, the balance of hardships weighs against SFG. Granting a preliminary injunction would effectively grant SFG the relief it desires at great expense to Defendants, despite the Court's conclusion that SFG has not shown some likelihood of success on the merits. The Court thus concludes that the extraordinary remedy of injunctive relief is not justified here.

## CONCLUSION

For the foregoing reasons, SFG's motion for a preliminary injunction (Dkt. No. 9.) is denied.

ENTERED:

Dated: October 10, 2019

Andrea R. Wood
United States District Judge